Good morning. I apologize, Your Honor, I was making use of your attorney lounge. That's what it's there for. You're doing fine. Thank you. And you skipped the third case. I represent the plaintiffs in this case. The plaintiffs were several groups of individuals who collected signatures for initiatives in Oregon in the 2004 cycle. It requires about 75,000 valid signatures for a statute and about 100,000 valid signatures for a constitutional amendment. After they'd collected about 90% of all of the signatures that they were collecting, which were due July 2, 2004, the Secretary of State in June 2004, just a month before the deadline, suddenly told them about new, previously unknown, and never-before-applied rules pertaining to the signatures and dating of initiative petitions, not by the voters, but by the circulators of the petitions themselves. These rules took the form of a two-column, one-page piece of paper that was handed to the plaintiffs in June of 2004 with entirely new rules that ended up disqualifying for each of them in the range of 5,000 to 10,000 of the signatures on their initiative petitions. Scalia. Counsel, before we get into that issue, may I suggest we talk a little bit about what the district court called mutinous, which might also be called standing? In other words, is there a live controversy here to the extent that even if all of the disallowed signatures were added in, that the third petition would still fail to meet the minimum number? That is what the district court concluded. However, what we are at, what the district court ruled was that the case was moot due to voluntary cessation of the challenged conduct by the defendant. We think that that ruling is incorrect because the Secretary of State never ceased the conduct. What he did is during the process of the trial in district court, he said that he was withdrawing some of his new unwritten rules, but in fact did not. He continued to apply those to the petitions that had been submitted by the plaintiffs. Then now what the State argues is that eight months, ten months after applying these unwritten rules, the Secretary of State has adopted some formal rules that are somewhat similar and somewhat different than the unwritten rules he had applied to the petitioners to the petitions. We argue that even if the district court is correct that reinstating for the one petition, all of the signatures that were disqualified by the unwritten rules does not defeat either standing or create mootness. It doesn't defeat standing because as we pointed out and alleged and supported with affidavits and was never contested, the imposition of the unwritten rules caused enormous additional cost and consternation to the plaintiffs. In Oregon, we have a process that's called early turn-in. You can turn in your signatures early if you have facially enough signatures. And so many of the plaintiffs did that in late May of 2004. And this is when these new sudden unwritten rules were announced. Rules such as if the circulator is writing a date on his own signature, if he starts to write the wrong month, let's say it's the end of the beginning of April, and he starts to write a 3 because in his mind it still is the month of March, and he goes, well, you know, it's now April 1st. I will cross out the 3 and put in a 4. The Secretary of State disqualified all of the voter signatures on that sheet, and there can be up to 20 voter signatures per sheet. And, of course, the voter signatures are separately verified in a process which the government conducts, both the Secretary of State and the county election offices. So after they were handed these unwritten rules and told that several tens, that 5 or 10,000 of their signatures were being disqualified, they had additional cost and monumental effort to get there, to either qualify their measures for the ballot or make additional efforts to qualify and fail. So it seems to me that the district court established a test that I would say threading the needle, and I don't know that this circuit has ever adopted such a test. Under the district court analysis, two of the measures that were the plaintiffs, that were represented by plaintiffs in this case, ultimately did qualify for the ballot. They did collect enough signatures, despite the fact that approximately 10,000 or so were disqualified by these new, you know, really, what we believe are really absurd rules. So the district court said, well, since they qualified for the ballot, then it's moot. Then one of the groups, however, did not qualify for the ballot, and the district court concluded since it did not qualify for the ballot, it was also moot. So the only, it seems to me, it makes it virtually impossible to obtain judicial review of the Secretary of State's actions in this case. The only way you could possibly obtain judicial review is if you redoubled your effort and then just barely fell short. And I don't know of any case in the circuit that requires such, particularly in the case of election law. It also reminds me. Counsel, if you argue that it's capable of repetition, you get beyond the mootness argument, don't you, with respect to the third petition? Yes, I believe we do. And we cited in the reply brief in particular the extensive discussion of this recently by the court, this September in the Caruso v. Yamhill County case, which also we had basically the same folks. I was representing the plaintiff, and the State of Oregon was representing the defendant in that case. And in the Caruso case, the Ninth Circuit concluded that often election law cases are capable of repetition, yet evading review, and that it is not even necessary for the plaintiffs to express an intention to circulate similar initiatives in the future. That is, it's some cases and other circuits upheld that there has to be some sort of a finding that the plaintiffs are going to take this action again in the future, but that is not what the Ninth Circuit adopted in Caruso just three months ago. In addition, it sort of becomes a Charlie Brown-Lucy kind of a problem, I think. And that is, you'll recall the scenario where Charlie Brown tries to kick the football, and Lucy always promises she won't pull it out from under him, and then at the last minute always does. You would think that at some point Charlie Brown would become discouraged and stop trying to kick the football. That, I think, describes the plaintiffs in these cases. These folks are long-term activists in the initiative process and in government processes in Oregon. And so they bring forth initiatives on a regular basis, and they keep trying to kick the football, even though the Secretary of State, Lucy, keeps moving the football at the last minute. You acknowledge that there's published regulations now affecting the requirements for gathering the signatures. Doesn't that cut against the argument that this particular scenario is capable of repetition? Your Honor, I don't believe so because the particular scenario we're referring to is one in which the Secretary of State at the last minute imposes rules, unwritten rules or rules that were never before announced to the circulators or to the initiative sponsors. Now, even before this one page of new rules was announced in, you know, after 90 percent of the signatures for the cycle had already been collected and there was only 30 days left, the Secretary of State already had a 66-page, single-spaced manual of rules pertaining to precisely the collection of signatures on ballot measure petitions. So simply at the last minute, he came up with another, you know, another page of rules. So even though now he has adopted another three pages of rules, he adopted those in April of 2005, our argument is and what we are asking this Court to declare is that it violates the constitutional rights of the plaintiffs for the Secretary of State to then have new unwritten rules or the opportunity to adopt new unwritten rules and apply them, particularly apply them as he did in this case, retroactively to signatures that had already been collected. The measures that we are talking about here were qualified for circulation in the spring of 2003. And so they went through more than a full year of collecting signatures before they had any idea that the Secretary of State would then be adopting, would be imposing and adopting these new rules. So that's one way that I think it's, it doesn't defeat it. Another way is that the rules that are adopted by the Secretary of State are different than the unwritten rules that he imposed. Several of them are different. For example, under the unwritten rules, he said that he would accept a dating of a circulator's signature in European format. That is, where you go year, month, day, or you don't do day, month, year. The unwritten rules, however, the new written rules, however, do not allow that. There are many other differences between the unwritten rules and the new written rules. But there are really two fundamental points. One is that we're asking the Court to tell the Secretary of State that we can't, you can't impose unwritten rules after the signatures have been collected pursuant to the written rules. And number two is that he cannot disqualify, he cannot have the, what some courts have called the irrational sanction of disqualifying voter signatures when his, the supposed defects or errors he's finding in the circulator's signatures have nothing to do with the validity of the voter's signatures, which are independently verified by the government. Now, in this case, besides throwing out thousands of sheets simply because the circulator made a slip of the pen or a slight mental error when writing down the date, just as all of us do, at least I do on my checkbook, when I start a new month in my checkbook and I start to write the wrong number of the month, I just initial it. That's just the, that's typical commercial practice. When our circulators did that, the entire sheet was thrown out, even though the change was initialed. And even though there was no rule in any, in any way written down anywhere or conveyed in any way to plaintiffs or to anyone else, that altering a date, that is correct, making a correction to a date, would invalidate the signatures on the sheet. The other major... Counsel, could I interrupt you just briefly? Yes, ma'am. If your client make a claim for damages with respect to retrospective conduct, it appeared that this was not clearly mentioned in your brief. And if you did request damages for past conduct, where exactly did you do this? Your Honor, we did not ask for damages. We sought only declaratory and injunctive relief. All right. Thank you. That's helpful. Yes. The other category of conduct by the Secretary of State was to declare that on, that many of the circulator signatures were illegible. Excuse me. Before you get to that, what would you envisage an opinion from this Court to hold with respect to your claims, specifically, for example, the marked out or the altered date? Is that not covered by the final rules or not? The final rules are difficult to understand. And what the final rules say in the case of a marked out date is that they say that they leave in place what was the unwritten rule, that if you start writing a date, like a 3, and then you cross it out or kind of write over it a 4, under the new rules, that would still disqualify the entire sheet. The only way that you could resurrect that, according to the new rules, is if you did not make such an alteration, but instead if you had written the entire date incorrectly, you would then write the entire date correctly, and the circulator would then sign the sheet a second time. It doesn't make sense. Well, we're not going to tell the Secretary of State what rules to write. The challenge you have to make is that, for whatever reason, the rules are illegal, fail to comply with Oregon statutes, whatever. So I guess I come back to my question. Has not the Secretary of State at least issued a rule with respect to that problem? Yes, and I agree that those rules are not being challenged here. In fact, they are being challenged in state court. But what are you challenging here? Excuse me. I may need to interrupt. What we're challenging here is the Secretary of State's practice, as demonstrated in the 2004 election cycle, of retroactively applying unwritten rules, rules that the circulators can't have any possible knowledge of, and applying those rules to disqualify signatures, both because there's no notice. It's similar to the Briscoe case in Chicago in 1967, where suddenly the Board of Elections adopted The funny thing is, in Briscoe, the Board of Elections actually did adopt written rules and did promulgate them, but the circuit court threw them out because they were not sufficiently conveyed to the circulators. Here, we've got 90 percent of all the signatures collected before anything is conveyed to the circulators about these new unwritten rules. All right. That's the past. But you're asking for injunctive and declaratory relief for the future. Have you made any showing before the district court that the Secretary of State threatens to do this again? What's the basis for your concern? That's what I have a problem with. The basis for the concern is the Secretary of State's practice of doing this and his refusal to disavow doing it again. He hasn't in any way said that he is going to cease applying unwritten rules. He has said, oh, now I'm going to adopt some written rules, but he has never disavowed the practice of then later supplementing those with unwritten rules. So what we are asking this Court to do is declare that the practice of applying unwritten rules retroactively to disqualify signatures that have already been collected violates the rights of the plaintiffs. In addition, we're asking for a declaration that it is a unconstitutional and irrational sanction for when you find if there are trivial errors in a circulator's signature or date. I wouldn't even call them errors. Trivial irregularities in the circulator's signature or date. It's an irrational sanction, then, to disqualify the voter signatures. And we contend that that violates the rights both of the circulators, the Petitioners, and the voters themselves. If I'd like, if that's possible. I just want to pursue one. Yes. Are you attacking anything currently? In other words, are you attacking the fact that he did it and disqualified the voters for the third petition? Otherwise, you would have had enough votes. I'm trying to talk about standing here. Are we being asked to give an advisory opinion? No, Your Honor. What if we get a new Secretary of State who never does any of this? What if you do? Well, we would celebrate that we don't have that circumstance. We have a circumstance where the Secretary of State feels perfectly free to retroactively impose unwritten rules. I understand your position. Thank you. Thank you, Counsel. You may reserve the remaining time for rebuttal. Thank you. We'll now hear from the State. Good morning. May it please the Court. Richard Wasserman for the Oregon Secretary of State. In analyzing the mootness issue, I think it's important to begin with looking at the relief sought by the plaintiffs, as Judge Nelson correctly focused on. In their — in the operative complaint, they sought, number one, a declaratory judgment that the Secretary's implementation of rules, in other words, the disqualification of signature sheets in 2004, was invalid, and sought preliminary and permanent injunctive relief requiring the Secretary of State to count those signatures for those 2004 initiatives. There were no — there was no damages claim, as Counsel correctly acknowledges. Those — that relief, none of that relief at this point can be granted in a live controversy. There is no live controversy concerning what the plaintiffs were arguing about in this lawsuit. Well, now, Mr. Meek brings our attention to the Caruso case. Yes. What about Caruso? Caruso correctly considers the principle of capable of repetition, yet evading review, and concluded in that — in that case that it applied in a particular way. In this case, it doesn't apply in the same way. Certainly, that principle exists under Federal law. We don't see it. Perhaps you should lay that out so we understand the distinction that you're making. Well, here, in directly addressing capable of repetition, yet evading review, we have post-judgment in this case, post-district court judgment, we have new administrative rules — a new administrative rule adopted by the Secretary of State, which clearly sets forth the, frankly, simple and rudimentary requirement of a dated signature. It also clearly explains how, if a circulator begins to make a mistake, how to correct that to avoid having the entire sheet of signatures disqualified. And I point the Court to Addendum 4 in the red brief, subsection 2d, where the original date is crossed out and a new date is provided. If the circulator resigns, having originally put the wrong date, the signature sheet is good. The reason why this case, or at least a key reason why this case is not capable of repetition, yet evading review, is not only — two, number one, most, if not all, of the plaintiff's claims are based on what they like to call the Secretary's application of unwritten rules. There is now a written rule. Second, the written rule allows circulators to avoid the kinds of mistakes that led to the disqualification of some signature sheets. If they follow the rule, this won't recur. The recurrence of similar facts is solely within the plaintiff's power. They simply need to exercise the same care in the exercise of their rights that they expect the Secretary of State to exercise in protecting their rights. Excuse me, Counsel. What if at the last minute, the Secretary of State says, by the way, I've looked at all these signatures, and I'm going to require that each signature be verified by somebody else? What if that happens? He adds unwritten rules at the last minute. Well, if the Secretary of State were to do that, that might conceivably be a problem if there were no fair notice. In this case, it's purely speculative, of course, that anything like that would happen. The rule that the Secretary of State has adopted has the full force of law. Under Oregon law, it has to be complied with by the Secretary of State, and it's pure speculation on the plaintiff's part that the Secretary of State won't comply with that rule. Speculation is simply not enough to keep a controversy alive. If he doesn't, then there is immediate chance for filing a claim for injunctive and a territory relief on the part of the plaintiff? Yes, either in an Oregon court or in a Federal court. Right. Thank you. And as Counsel notes, there is an immediate opportunity to challenge the rules on their face, which is being done under the Oregon Administrative Procedure Act, under Oregon law. So if these rules are, in fact, which we believe that they're not, but if these rules were on their face, invalid under the Federal Constitution, they can be struck down by an Oregon court. Now, in plaintiff's reply brief, they rely on what they term, and I'll use their, quote, the Tucson 5 case and the Serrano case both show, I think, to the contrary, that this case is moot. First, the phrase, lingering palpable effects, was nowhere used in any of the — in either of those cases, and really is a concept that seems to have much more relevance, or would have much more relevance, if this were a damages claim, which it is clearly not. Tucson was prison litigation. The members of this court are probably familiar with it, having seen Tucson at least five times. It's prison litigation in which the fifth time the case was in front of the court, inmate access to courts was an issue, specifically access by inmates in some sort of segregation. And the court held that the access issue became moot after the prison unilaterally opened a separate library for segregated inmates. In Serrano, the plaintiff had brought an action seeking to require the city to issue him a permit under a city ordinance to put news racks on sidewalks. In the course of the litigation, the city amended its ordinance to eliminate the permit requirement, and the court — this court held that the case became moot as a result of that action by the city, the ordinance amendment. In each of those cases, the common thread is that the defendant took action voluntarily to eliminate future problems, resulting in this court declaring the case moot. And that's exactly what the Secretary of State has done in adopting this new rule. In their reply brief, the plaintiffs rely on a Third Circuit case called Princeton, which obviously doesn't bind this court and so is of limited value in this circuit in any event, but nor is that case even remotely on point. What had happened in the Princeton case is that an opinion of the State Bar that had concluded that certain type of action by lawyers was unethical was suspended by the committee that issued it, pending a possible revision by the State Supreme Court of the disciplinary rulings in question. But, of course, the opinion, although suspended, was still sort of out there for people to read. To read, the court held that the case wasn't moot because of the continuing chilling effect of that opinion. I think that's easily distinguishable, first of all, on the facts of that case, unless the State Supreme Court had changed the rule, it was clear that that opinion was coming back in full force. And, of course, this court presumably is aware that even if it vacates one of its opinions, presumably, for instance, because the case became moot or otherwise, if the opinion discusses a question of law, it is still out there. If it's a published opinion, it's still out there for people to read. And people who are trying to confine their affairs to lawful conduct will still continue to view that as what the law in this circuit is likely to be if the issue arises again in a live controversy. That simply has no parallel in this case because the supposed unwritten rules that plaintiffs continually refer to have been replaced by a published administrative rule that has the force of law in the State of Oregon. So there's simply no parallel to the Princeton case. Perhaps the most troubling aspect of plaintiffs' reply brief is a section of their brief where they make a series of assertions, a litany of things that the Secretary of State has supposedly not disavowed, that in plaintiff's view keep this as a live controversy. Those assertions are facially inaccurate. First, they assert that the Secretary, and I'll be using quotes here, has not disavowed the future use of unwritten and undisclosed rules to disqualify sheets of signatures, unquote. That's plainly false. Under Oregon law, as a matter of law, by formally adopting the new rule, the Secretary of State has legally bound himself to apply that new rule. In Greenwood and Serrano, similar law changes by the defendant in those cases were held to have mooted the case. The plaintiffs also assert that the Secretary, quote, has not disavowed discriminating against ballot measures he does not personally endorse in evaluating circular signatures, unquote. Plaintiffs continue to assert that the Secretary of State discriminates based on political or personal bias against the subject matter of certain ballot measures. That assertion disregards an express finding after trial by the district court that the Secretary has never rejected signatures based on the subject of the initiative petition. The district court found no evidence of bias. The plaintiffs have not challenged that as clearly erroneous, nor could they credibly do so. It is reasonable for the plaintiffs to suggest that this time, bias simply disregards a binding finding of fact by the district court. Plaintiffs assert that the Secretary has not, quote, disavowed discriminating against circulators who are not Oregon registered voters, unquote. That ignores the fact that under the new rule, and as I explained in the red brief, chief petitioners may submit for circulators who are not registered voters in Oregon exemplars of circulator signatures at the same time that they submit the signature sheets. So the Secretary of State has signature exemplars as immediately available, if not more so, for unregistered, for people who are not registered to vote in Oregon, as the Secretary has for people who are registered to vote in Oregon. There is no credible claim here of discrimination against people, against circulators who are not registered to vote. Mr. Wasserman, can I come back to the first point you made with regard to the claims made in Mr. Meek's responding brief? You said that the new rules that have been promulgated, in essence, disavows the practice of coming up with rules after the certification period begins. But if I understood Mr. Meek correctly, he said that before these new rules were promulgated, there was already an existing set of rules, and that didn't prevent the Secretary in this case from augmenting or adding to the rules after the period for gathering the signatures was certified and began. Well, I think what counsel is referring to is the initiative and referendum manual, which is a guide for people who circulate petitions in Oregon. And it's written mostly in textual narrative form rather than in rule form, but it is, as a whole, adopted as an administrative rule. What the plaintiffs like to refer to as unwritten rules are simply the Secretary of State's decisions on some things that fell within the interstices. What happens if this unforeseen circumstance occurs? They have to deal with it. This is how we're going to deal with it. That's what's being referred to as unwritten rules. The initiative and referendum manual is published on a regular two-year basis, and it's updated and regularly adopted as rule. It's given the detail of the new rule that's in place and the clear instructions on how to do signature sheets and how to correct mistakes if they're made and avoid disqualification. It would be purely speculative to suggest that there's going to be some new raft in the future of unwritten rules to derail a petition-gathering effort. Another assertion that the plaintiffs make in their reply brief is that the new rule permits disqualification for illegible signatures, and that's simply wrong. It ignores the other provision of the rule that says an illegible signature is not disqualifying if it matches the exemplar. In other words, if a circulator has an illegible signature on his or her exemplar and uses the same signature on a signature sheet, that's not going to be a disqualifying factor. Petitioners' assertion to the contrary is simply wrong. I thought exemplars were only required for out-of-state voters. Are they required for all voters? Well, for people who are registered, for circulators who are registered to vote, the Secretary of State has on file voter registration cards, which are used as exemplars. Thank you. I believe that the merits are outside of this Court's jurisdiction, and there's little reason to discuss, but there are a couple key points that I would like to make. In particular, the issue concerning voters' rights, which the plaintiffs tried to argue separate from the rights of chief petitioners and circulators. Our point is simply that under the fundamental structure of the initiative system, voters have to rely on chief petitioners and circulators to comply with the law. If the Secretary of State's dated signature requirement, which is a pretty rudimentary requirement, very simple to comply with, if it's lawful as to chief petitioners and circulators, it is necessarily lawful as to voters. Voters simply are in a position that they have to rely on compliance with the law by others, namely chief petitioners and circulators. And if a chief petitioner or a circulator doesn't comply with a valid law, the voter's signature is simply tossed out. That's just a product of the structure of the initiative system, and it's unavoidable. Voters don't have a right, independent of either chief petitioners or circulators, to independently submit their own signature to the Secretary of State and have it counted. That's the only point we're trying to make. If the requirement were invalid, then it would be invalid as to voters. But if the requirement is valid, it's valid as to voters. I see my time is almost done. I've said everything that I was hoping to say, and unless the Court has any questions, I will conclude. No further questions.  Thank you, Mr. Wasserman. Mr. Meek, you have some reserved time. On voluntary cessation, two points. First, the Secretary of State has never disavowed the practice of applying unwritten rules. You simply will not find that in any document filed in this case or in any brief that's filed by the Secretary of State. As we pointed out, there was already 66 pages of rules. It is the Initiative and Referendum Manual. It is an exhibit in this case. Both the 2002 manual and the 2004 manual are exhibits. Those are the rules applicable to the process. Those rules were followed by the plaintiffs in this case, but then the Secretary of State came up with his unwritten rules after 90 percent of the signatures had been collected, and he has never, not once, ever disavowed his opportunity to do that in the future. Counsel, are there any current rules that are in writing that you are claiming are unconstitutional? Your Honor, no, because this case does not deal with the rules that were adopted 10 months after the Secretary of State applied unwritten rules to my client's petitions. All right. Now, if you want to take a look at those. You answered the question. That's fine. Yes. If you want to take a look at those rules, we find them, for example, to be rather objectionable. For example, one of the criteria that says no petition sheet will be rejected, a petition sheet will be rejected for insufficient circulator certification if any part of the original date is overwritten with a different date. Counsel, isn't your remedy for that kind of objection the Oregon Administrative Procedures Act and the methodology established under Oregon law to challenge those rules? Absolutely. And those challenges are proceeding in state court. On voluntary cessation, however, it is the burden of the defendant to show that the practice has ceased. And the practice that we're complaining about is the practice of applying unwritten rules retroactively, the kind of practice which has never been disavowed. And the cases, even the cases that the defendant cites, indicates that the burden of demonstrating mootness is a heavy one, is carried by the defendant, and the defendant must show that it can't happen again. That's in the Los Angeles County v. Davis case. Of course, this is not at all like Gator, where both the plaintiff and the defendant agreed that the conduct would cease. The U.S. Supreme Court cases that are cited on pages 21 and 22 of my reply memorandum indicate that voluntary cessation moots a case only if it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and interim events have completely and irrevocably eradicated the effects of the alleged violation. Mere voluntary cessation of allegedly illegal conduct does not moot a case. If it did, the courts would be compelled to leave the defendant free to return to his own ways. And that's exactly the circumstance here. If this court does not make a ruling that the Secretary of State cannot apply unwritten rules retroactively, then the same conduct can recur in the future, and there will be nothing to prevent it. We'll just be back in the same circumstance we were in the first time. That is, the unwritten rules are sprung at the last minute. You immediately go to court to try to correct it, and you end up not getting a ruling on the merits. And we did not get a ruling on the merits here. As far as inaccurate assertions on not disavowing it, please take a look at the record. There is nowhere that the Secretary of State disavows using unwritten rules in the future. The eligibility rule continues. There are a variety of problems with the new rules, but we, you know, but then again, what we're complaining about here is application of unwritten rules and application of rules which disqualify voter signatures simply because the circulator makes some sort of a trivial so-called error. And finally, I urge. I hate to interrupt you, but are you trying to revive petition number three on the theory that it would have qualified? No, ma'am. We're asking for declaratory relief and injunctive relief ordering the Secretary of State not continue this practice of applying unwritten rules. But we're not asking that that measure be placed on the ballot. Finish your last sentence. I interrupted you. Please. My last sentence would be that the case I recommend reading more than any other is the Briscoe v. Cusper case. I believe it was Seventh Circuit in about 1970. It's very parallel to this circumstance where new rules are suddenly sprung on folks after they collected the signatures and the circuit court found no problem in finding that unconstitutional. And that was cited in your brief, I take it? Yes. Thank you, Mr. Mead. Thank you. The case just argued will be submitted for decision.
judges: D.W. Nelson, O'scannlain, Burns